UNITED STATES of America, Plaintiff,

v.

Timothy James McVEIGH and Terry Lynn Nichols, Defendants.

Criminal Action No. 96–CR–68–M.

United States District Court,
D. Colorado.

Oct. 25, 1996.

Patrick Ryan, U.S. Attorney for the Western District of Oklahoma, Oklahoma City, OK, Joseph Hartzler, Special Assistant U.S. Attorney, Assigned from S.D. Illinois, Denver, CO, for plaintiff.

Stephen Jones, Richard H. Burr, III, Robert Nigh, Jr., Jones, Wyatt & Roberts, Enid, OK, Jeralyn E. Merritt, Denver, CO, for defendant McVeigh.

Michael Tigar, Ronald G. Woods, N. Reid Neureiter, Denver, CO, for defendant Nichols.

## MEMORANDUM OPINION AND ORDER FOR SEPARATE TRIALS

MATSCH, Chief Judge.

The Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma, was destroyed by an explosion on April 19, 1995, killing and injuring many people. Timothy McVeigh and Terry Nichols have been joined as co-defendants in an indictment, containing 11 counts, charging offenses alleged to be connected together as parts of a common scheme or plan to bomb that building. This joinder of defendants and offenses is appropriate under Fed.R.Crim P. 8. Each defendant has moved for separate trials claiming prejudice under Rule 14, which provides as follows:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance. of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

These motions have been fully briefed and evidence was submitted at a hearing beginning on October 2, 1996. The parties filed additional papers under seal because they

refer to discovery material and include attorneys' assessments of that material and statements of their respective positions in anticipation of a trial. The court has reviewed the sealed material *in camera* as permitted under Rule 14 and finds that the sealing meets the criteria set out in the Memorandum Opinion and Order on Media Motions issued January 24, 1996. *United States v. McVeigh,* 918 F.Supp. 1452 (D.Colo.1996). While the sealed material has been helpful to establish context, the factual bases for the findings and conclusions supporting this order are fully disclosed in this memorandum opinion.

The most significant sealed documents are FBI reports of statements made by defendant Terry Nichols to FBI agents during a nine hour interview on April 21, 1995 at the police station in Herington, Kansas. These reports (including agent notes in sealed Exhibit 72) were reviewed during the hearing on Mr. Nichols' motion to suppress agents' testimony about his interview and the government's motion *in limine* for an evidentiary ruling that testimony concerning some of the statements is admissible against both defendants. This court denied the Nichols motion to suppress and the prosecution motion *in limine* in the Memorandum Opinion and Order on Motions to Suppress Evidence and Regarding Admissibility of Statements of Terry Lynn Nichols issued August 14, 1996. *United States v. McVeigh,* 940 F.Supp. 1541 (D.Colo.1996). The most pertinent statements were paraphrased in the record of that hearing and were described in that opinion.

The Advisory Committee Notes published with Rule 14 when it was adopted in 1944 observed that it was a restatement of existing law that severance and other similar relief is entirely in the discretion of the court. The Advisory Committee Note to the 1966 Amendment observed: "A defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant. This prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand." The Note further explained the need for *in camera* inspection of such statements to aid in determining whether the possible prejudice justifies ordering separate trials.

The appellate courts have attempted to guide trial courts in opinions reviewing joint trials of defendants after denial of motions to sever. These opinions reveal the obvious advantage in hindsight. An appellate court can measure the extent of any actual prejudice from a joint trial by analyzing a complete trial record. Ruling on a Rule 14 motion before trial requires the trial judge to anticipate the evidence and events of a future trial. The presumed benefits of a joint trial must be weighed against the potential for harm to the integrity of the trial process.

Trials, like all human events, are unpredictable. All of the participants interact in a public process, which, in essence, is an historical inquiry into past events to determine whether the prosecution has proved the defendants guilty of the crimes charged within the rules of evidence and the applicable law. The frailties of human nature require some constraints on the procedures used to achieve an acceptable outcome. In some cases, a court may proceed with a joint trial and take remedial action when actual prejudice occurs. Even risk of a mistrial or reversible error may be acceptable under certain circumstances. This is not such a case. The nature and scope of the charges, the quantity of the evidence and the intensity of the public interest in all aspects of this criminal proceeding compel caution and restraint in ruling on these motions. The question they present is whether separate trials are necessary to provide such fundamental fairness as will ensure confidence in the outcome of the trial process.

Each defendant is entitled to a jury's separate and independent evaluation of the evidence received against him in any trial, regardless of the number of other persons alleged to have participated in the crimes charged. When two defendants are tried together, the court routinely instructs the jury accordingly and requires them to return separate verdicts. The court commonly cautions the jurors that, in reality, two cases are being tried simultaneously and their findings as to one defendant must not control the decision as to the other defendant. Multiple defendants may be tried to-

gether when there is sufficient common evidence or when there is direct evidence showing the different, but connecting roles of each defendant. It is more difficult to conduct a joint trial when the prosecution must rely on indirect and circumstantial evidence to identify the perpetrators of a crime. When the court believes that such separate consideration is not reasonably to be expected, separate trials must be ordered.

To obtain a severance under Rule 14, a defendant must show either a "serious risk" of actual prejudice to a specific protected right or a likelihood that a jury would be unable to make a reliable decision in a joint trial. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993); *United States v. Williams*, 45 F.3d 1481, 1484 (10th Cir.1995). A showing of potential prejudice is not enough to require separate trials, recognizing the public interest in economy and expedition in judicial administration. *United States v. Dirden*, 38 F.3d 1131, 1140 (10th Cir.1994). The policy preference for a joint trial is particularly strong when a conspiracy is charged. *United States v. Hardwell*, 80 F.3d 1471, 1486 (10th Cir.1996). This court has conducted many multiple defendant trials. Prejudice has been avoided by the use of stipulations as to certain facts and agreed redactions from exhibits and testimony. *See, e.g. United States v. Lane*, 883 F.2d 1484, 1501 (10th Cir.1989).

The McVeigh motion for severance centers on expected testimony of FBI agents about their conversations with Terry Nichols on April 21 and 22, 1995. Government counsel have unequivocally said that they will use some of these statements as admissions of Terry Nichols even if that requires severance. The government's position is succinctly stated in this paragraph in the brief in opposition to the defendants' motions:

> Nichols' statements are, without question, important to the case against him. The prosecution cannot forego, even upon pain of severance, Nichols' admissions regarding: (1) his April 16 Oklahoma City trip; and (2) his purported truck loan to McVeigh on April 18. The former state-

ments are important both for their truth (showing Nichols' involvement in what other evidence will prove was the conspiracy to bomb a federal building) and for their falsity (showing that Nichols lied about various matters, such as his prior contact with McVeigh and the reason for his trip). The latter statement is important primarily for its falsity, because other evidence will show that Nichols could not have loaned McVeigh his truck at the times and under the circumstances he claimed. There is, under these circumstances, no viable option of redaction, and again the prosecution would urge some form of severance rather than redaction.

Docket entry 2165 at 39–40.

The government unsuccessfully sought a ruling that three "core admissions" may be considered as evidence against both defendants because, in the context of other expected evidence, these particular statements by Terry Nichols inferentially incriminate him, making them statements against his penal interest within the exception to the hearsay rule in Fed.R.Evid. 804(b)(3). In substance, the prosecutors say Terry Nichols admitted: (1) that Terry Nichols met with Timothy McVeigh in Oklahoma City and drove him to Junction City, Kansas, on April 16; (2) that Terry Nichols loaned his truck to Timothy McVeigh for his use in Junction City, Kansas, on the morning of April 18 and (3) that Terry Nichols removed items belonging to Timothy McVeigh from a storage locker in Herington, Kansas, on April 20.

The FBI reports include these statements among many others made during an interview lasting more than nine hours in the Herington, Kansas police station on April 21. Government counsel say that they do not intend to introduce other Nichols' statements that refer to Timothy McVeigh or that include speculation about the possibility of Mr. McVeigh's involvement in the bombing. The government's argument that Terry Nichols' statements should be considered evidence against Timothy McVeigh was that Terry Nichols connected himself with Timothy McVeigh in ways which Mr. Nichols must have known would subject him to criminal liability. The court ruled that while these

statements are admissions as to Terry Nichols, they are hearsay as to Timothy McVeigh because the prosecution did not show that when he made those statements Terry Nichols knew that Timothy McVeigh participated in the bombing of the building. *United States v. McVeigh*, 940 F.Supp. 1541 (D.Colo. 1996). Such knowledge of Mr. McVeigh's guilt would be the minimum basis for drawing any inference that by describing these contacts with Timothy McVeigh, Terry Nichols thought that he was incriminating himself. If these statements of Terry Nichols are taken as true, they tend to incriminate Timothy McVeigh by placing him in Oklahoma City on April 16 and in Junction City on April 18, in light of the government's stated intention to attach significance to his being in those places at those times by other evidence. Terry Nichols' removal of Timothy McVeigh's property from a storage locker on April 20 may also be incriminating as to Mr. McVeigh in the context of other evidence.

▇ The government now argues that even though testimony about Mr. Nichols' statements is inadmissible hearsay as to Timothy McVeigh, he will not be prejudiced in a joint trial because a properly instructed jury should be expected to disregard such testimony when they evaluate the evidence against Mr. McVeigh. The government also suggests that some of Terry Nichols' explanatory statements should not be classified as hearsay because they will not be offered for their truthfulness. Indeed, to the contrary, the prosecutors say that they will try to prove, by other evidence, that Terry Nichols' explanations for his actions on April 16, April 18 and April 20 are false and that he lied to the FBI to try to avoid his criminal liability. False explanations of incriminating evidence are probative of a consciousness of guilt. *United States v. Hackett*, 638 F.2d 1179, 1186–87 (9th Cir.1980).

It must now be assumed that Terry Nichols will not testify at a joint trial. The Fifth Amendment prevents the government from calling him as a witness and there is nothing to require him to decide about testifying in his defense before the government concludes its evidence. Therefore, Timothy McVeigh's lawyers will have no opportunity to cross-examine Terry Nichols about his statements. Moreover, because this testimony from FBI agents will not be received as evidence against Timothy McVeigh, his counsel may not even cross-examine the agents on what they say that Terry Nichols said. And, the prosecutors suggest that to avoid any incriminating effect on Mr. McVeigh from any other statements of Terry Nichols, the court must restrict his lawyers' cross-examination of the agents.

To evaluate Timothy McVeigh's claim of denial of his right of confrontation, the court must expect that at trial government counsel will call one or more of the four FBI agents who talked with Terry Nichols on April 21 and 22, 1995, to testify as to their recollections of what he said about these "core admissions"; that counsel for Mr. Nichols will cross-examine them only on the statements included in their direct testimony; that counsel for defendant McVeigh will not cross-examine the agent witnesses and that the jury will be instructed to consider the agents' testimony only for what they think it shows as to the activities, personal knowledge and state of mind of Terry Nichols. The prosecutors expect to connect up Terry Nichols' statements by evidence that these two men joined together at times to perform acts which resulted in the bombing of the Murrah Building on April 19, 1995. The government lawyers will ask the jurors to be selective in their consideration of the FBI testimony about the Nichols' interview, believing those statements which admit his conduct fitting into their theory of the case, disbelieving his apparently innocent reasons for these actions as fabricated exculpatory explanations and disregarding all of it in deciding the case against Timothy McVeigh. The prosecutors will argue that the reason the jury should disbelieve Terry Nichols' explanations is that other evidence will show a close relationship between these men for several years; that both of them, at times, expressed similar views suggesting a common motivation for the conspiracy charged in count one; and that each of them did things, together and with other persons, to carry out a common scheme to destroy the Murrah Building and its occupants.

The lawyers for Terry Nichols can be expected to conduct a vigorous cross-examination of the FBI agents, perhaps directly challenging the credibility of their testimony and undoubtedly suggesting that the meaning of the statements attributed to Mr. Nichols on direct examination is distorted unless it is considered in the context of the entire interview and the circumstances under which it was conducted. They will rely on such cases as *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), to assert the right to such cross-examination. Rule 611 gives the court discretion to permit that inquiry, and denial of it to protect against prejudice to Timothy McVeigh would, in turn, severely prejudice Terry Nichols. The court cannot save a joint trial by sacrificing the interests of one defendant to protect the other.

In their attempt to show that Mr. Nichols' entire story is credible and totally consistent with his lack of guilt, his lawyers will probably suggest that any inconsistencies or misstatements were because Terry Nichols was under intense pressure during the more than nine hours that he was interrogated by two teams of FBI agents on April 21 at the police station. While the court has read the agents' written reports of their conversations with Terry Nichols, it has no information about what those agents asked him, what they told him about their suspicions or what they revealed about the investigation. The court must assume that there was interactive conversation during the long interview and there is a high probability that the agents used their skills to keep Mr. Nichols talking to them. These are subjects appropriate for cross-examination under the rule of completeness.

It is reasonable to anticipate that Mr. Nichols' counsel may attempt to portray Timothy McVeigh as a participant in the bombing of this building who duped his friend Terry Nichols into providing unknowing assistance. Included among the statements of Terry Nichols in the portions of the FBI reports disclosed in the hearing and mentioned in this court's earlier opinion is this: "I feel upset that I am involved, in a sense, because of him, and knowing that I am not."

That can be reasonably construed as Mr. Nichols' expression of a belief in Mr. McVeigh's guilt. Timothy McVeigh's lawyers have no chance to ask Terry Nichols whether he said these words or what he meant by them.

There can be no effective separation of Terry Nichols' explanations for his conduct from what he reportedly said Timothy McVeigh told him. For example, the FBI agents reported that Terry Nichols said that he went to Oklahoma City on April 16 at Timothy McVeigh's request to get a television set Mr. McVeigh was returning to Mr. Nichols from his ex-wife and son in Las Vegas and that Mr. McVeigh said his car broke down while he was traveling on his way east to visit his family. To find that explanation false, as the government requests, the jury has several choices. They may infer that (1) Terry Nichols lied about what Timothy McVeigh said, or (2) Timothy McVeigh lied to Terry Nichols about why he was being asked to go to Oklahoma City, or (3) Terry Nichols fabricated the entire story. Mr. Nichols' lawyers may be expected to ask the jury to adopt the second possibility—that any false parts of Terry Nichols' statements resulted from lies told to him by Timothy McVeigh. The government may be satisfied with either the first or second suggestion. Only Timothy McVeigh has an interest in the third possibility—that all of what Terry Nichols said was false. He will not be able to advance that suggestion through cross-examination if the agents' testimony is not considered as evidence against him. Any effort made by Mr. McVeigh's lawyers to argue such falsity to the jury would contradict the caution that the testimony must not be considered as evidence against Timothy McVeigh.

The agents' testimony about the exculpatory statements of Terry Nichols can only be considered probative of his guilt if they are accepted as an implied admission of his guilt. That interpretation requires findings that Mr. McVeigh was a participant in the bombing, that Terry Nichols knew that Mr. McVeigh was a participant in the bombing and that Terry Nichols narrated a story interweaving true and false statements of fact.

Without an opportunity to cross-examine Terry Nichols or the agents, Timothy McVeigh is caught in a dilemma. There will be evidence that Terry Nichols and Timothy McVeigh were associated in several ways over a substantial period of time. The government and counsel for Terry Nichols will disagree about the credibility and meaning of Mr. Nichols' statements about his conduct on these three important dates, but they may well agree about the validity of other evidence linking these two men together in ways that may sound conspiratorial.

The adversary trial process depends upon cross-examination to determine the reliability of the testimony of witnesses. A skilled advocate will put questions which will reveal any failures or weaknesses in perception, recollection and recounting by the witness, as well as the effects of any character flaws, bias or prejudice he or she may have. Distortions, inaccuracies and incompleteness of direct testimony may also be disclosed as the cross-examiner seeks either to bring out the whole story, or suggest something quite different from what was sought to be proved. The indispensable role of cross-examination is well summarized in the following statement found in *Wigmore:*

> For two centuries past, the policy of the Anglo–American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.
>
> Not even the abuses, the mishandlings, and the puerilities which are so often found associated with cross-examination have availed to nullify its value. It may be that in more than one sense it takes the place in our system which torture occupied in the mediaeval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever invented for the discovery of truth. However difficult it

may be for the layman, the scientist, or the foreign jurist to appreciate this its wonderful power, there has probably never been a moment's doubt upon this point in the mind of a lawyer of experience.

5 *Wigmore, Evidence* § 1367 (Chadbourne rev. 1974) (footnote omitted).

The historic right of cross-examination was incorporated into the United States Constitution by the Confrontation Clause in the Sixth Amendment. Denial of that right has often created such loss of confidence in jury verdicts as to require reversal of convictions. *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *United States v. Begay,* 937 F.2d 515 (10th Cir.1991).

Timothy McVeigh will be profoundly prejudiced by a joint trial of this case. His lawyers cannot question Terry Nichols or cross-examine the FBI agents on what they say Terry Nichols said and they cannot control the cross-examination by Terry Nichols or follow up on any suggestions or inferences of guilt of Timothy McVeigh resulting from it. The latter may have the more severe prejudicial effect if Mr. Nichols' lawyers implicitly accuse Timothy McVeigh of lying to Terry Nichols. In short, Timothy McVeigh may be caught in cross-fire.

Traditionally, courts have relied upon jury instructions to separate the evidence in multi-defendant trials. The efficacy of that practice to avoid unfairness depends upon the level of confidence one may reasonably have in the ability of jurors to exercise their individual and collective discipline to follow such instructions in any particular case.

In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court followed several circuits and state courts in concluding that it was unrealistic to expect a jury to disregard the confession of a nontestifying co-defendant incriminating the nondeclarant defendant. Accordingly, the Court held that the Sixth Amendment right of confrontation is denied when such evidence is received at a joint trial. The *Bruton* rule was narrowed in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), where the Court said that if the co-defendant's confession is redacted to exclude any reference to

the existence of the defendant, an instruction directing the jury to avoid inferring any link to him may be expected to avoid violation of the Confrontation Clause, even though the hearsay statement may be incriminating in the context of other properly admitted evidence. *Id.* at 211, 107 S.Ct. at 1709–10. There is no need to review the succeeding cases in the circuit courts questioning the efficacy of such redaction to avoid any incriminating effect on the nondeclarant defendant when the link-up strongly suggests that the declarant's admission included the co-defendant. The difficulties involved were discussed by the Eighth Circuit Court of Appeals in *United States v. Long,* 900 F.2d 1270, 1278–80 (8th Cir.1990). Here there are direct references to Timothy McVeigh which, if believed, would be very incriminating in the context of other evidence and which may strongly corroborate some of that evidence.

The government concedes that deletion of Timothy McVeigh's name from Terry Nichols' extrajudicial statements is not possible. Such redaction would destroy any probative value of these statements, making them irrelevant. They have probative value only because they connect both defendants. In the Reply Brief of the United States Regarding Admissibility of Nichols' Statements, government counsel said: "Nichols core statements were incriminating precisely because, and for the most part only because, McVeigh too was involved." Docket entry 1563 at 8. They suggest a chain of inference that Terry Nichols knew that Timothy McVeigh participated in the bombing; Terry Nichols admitted his association with Timothy McVeigh and acts of assistance shortly before and after the bombing; Terry Nichols attempted to avoid implicating himself by giving false neutral explanations for his admitted conduct: therefore, Terry Nichols admitted that he too was guilty as a participant in the crime. The persuasive power of that reasoning depends upon the amount and weight of the evidence against Timothy McVeigh, which will not be known before trial.

At the court's request, government counsel submitted proposed limiting instructions. A copy of them is attached as an appendix to this opinion. A pre-trial evaluation of their projected efficacy is one of the intuitive decisions which a judge must make, based upon his experience with jury trials. The instruction to be given before the agents testify directs the jury to consider Mr. Nichols' implied consciousness of guilt.

> You may consider Mr. Nichols' statements to the FBI only as evidence of his own activities and his personal knowledge and state of mind. I anticipate that the government may ask you to find that certain of Mr. Nichols' statements were true but that others were false and that the alleged falsity suggests a consciousness of guilt on Mr. Nichols' part.

Appendix. As previously discussed, the jury may infer from his statements that Mr. Nichols believed Timothy McVeigh to be guilty. That danger is enhanced by the following language from the proposed final instruction:

> As a matter of law, you may not consider the testimony about Mr. Nichols' statements to the FBI agents in your deliberations about Mr. McVeigh. There is one obvious way for you to conduct your deliberations to make it easier for you to abide by that rule. That is to deliberate first as to whether the government has proved its case against Mr. McVeigh beyond a reasonable doubt. In this part of your deliberations, you could consider evidence admitted against Mr. McVeigh, but you could not consider in any way the evidence about Mr. Nichols' statements to the FBI agents. Once you conclude your deliberations as to Mr. McVeigh, you could then consider the charges against Mr. Nichols. In that part of your deliberations, and only in that part, you could consider the evidence of Mr. Nichols' statements to the FBI agents.

Appendix. The unacceptable risk is that any finding of not guilty as to Timothy McVeigh would be undermined by a determination that Terry Nichols confessed his guilty assistance. In short, there is an unacceptable risk that the jury will use Terry Nichols' extrajudicial statements against Timothy McVeigh in derogation of his Sixth Amendment right of confrontation and the fundamental fairness protection of the Due Process Clause in the Fifth Amendment.

Both defendants seek severance on the ground that their defenses are so antagonistic as to prevent a fair joint trial. The Supreme Court limited the use of antagonistic defenses as a basis for severance, holding that there is no per se rule of severance. More than mere "finger pointing" is required. *See Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 938–39, 122 L.Ed.2d 317 (1993). In *United States v. Dirden,* 38 F.3d 1131, 1141 (10th Cir.1994), the Tenth Circuit Court of Appeals instructed that severance on this ground should be granted only where the defenses are so antagonistic that they are "mutually exclusive." Thus, only when exoneration of one defendant requires incrimination of the other is severance required. That possibility has been shown in the foregoing discussion of the *Bruton* problem in this case. Counsel for Timothy McVeigh have argued that there is reason to believe the reverse of Mr. Nichols' suggested defense. Thus, there will be an effort to suggest that the whole purpose of Terry Nichols' visit to the Herington police station was to "frame" his friend Timothy McVeigh.

While the defenses of these two men may not fully meet the mutually exclusive standard, there will be substantial and significant differences in the tactical approaches taken by their respective counsel. At times they will have different positions on evidentiary objections, and different approaches to the cross-examination of the government's witnesses and in the presentation of defense witnesses.

The conflict between the defenses of these men is even more apparent if there is a joint penalty phase hearing. Convictions upon one or more of these charged offenses will generate mutually exclusive defenses of their lives because each defendant will try to portray the other as a more culpable perpetrator of the crime. There may be unavoidable prejudice if the defendants choose to testify against each other or if only one defendant testifies on his own behalf. Any efficiencies achieved in a joint liability trial will then be outweighed by extension of the time necessary for hearing the mitigating evidence presented by each of the defendants. The in-creased time necessary for a joint penalty phase trial may be critical since the court will no longer have alternate jurors available.

Preference for a joint trial of persons charged with conspiracy and with aiding and abetting crimes assumes efficiencies resulting in conservation of resources, reduction in inconveniences to witnesses and public authorities, avoidance of delays and mitigation of adverse effects on witnesses and victims. Such assumptions must be analyzed for their validity in any particular case and their value may be outweighed by the compelling interest in the fairness and finality of the verdict.

There are efficiencies and advantages in single focused trials. The time needed for jury selection is significantly reduced: the number of defense peremptory challenges is halved and only one defense counsel conducts voir dire questioning. It is easier to apply the rules of evidence when there is a trial of one defendant, particularly with regard to the admissibility of statements offered under Rule 801(d)(2); character evidence under Rule 404(a)(1) and proof of motive, opportunity, intent, preparation, plan, knowledge and identity under Rule 404(b). Given these considerations, it is far from certain that the time required for two separate trials would, in total, be substantially greater than the time required for a joint trial.

The prosecutors raise the possibility of inconsistent verdicts in separate trials as a policy objection to the defense motions. Inconsistent verdicts are possible whether the defendants are tried together or separately if the jury does give separate consideration to the evidence against each man. The Supreme Court has accepted different outcomes, even though they may be illogical, because of the unique role of the jury as factfinder in criminal cases. *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

The government has expressed some concern that the outcome of a first trial will make the selection of a jury problematic for the second defendant to be tried. Surely if a jury can be expected to give separate consideration to each of two defendants in a joint trial, a separate jury in a second single defendant trial should be expected to follow

instructions to disregard the verdict of the first jury or any of the events at the time of the first trial. The chances of obtaining fair and impartial juries in two separate trials would certainly be better than attempting to seat a jury after a mistrial or reversal and new trial as a result of prejudicial joinder.

The possibility of a joint trial with separate juries has been considered. Conceptually, that is a convenient solution. Logistically, it is impracticable. If 6 alternate jurors were seated with each jury, the courtroom would have to accommodate 36 jurors for most of the trial. Moreover, the use of two juries would, at best, accommodate only the *Bruton* problem of the Nichols' statements. It would not relieve the prejudice to each of the defendants from their antagonistic defenses requiring different tactics and strategies during the trial proceedings. It is reasonable to anticipate a need for extensive hearings outside the presence of the jury to consider conflicting defense objections and requests for cautionary instructions during the presentation of the evidence, including arguments about whether both juries can hear particular testimony or see certain exhibits. The resulting delays would interrupt the rhythm and flow of the proceedings and risk unforeseeable adverse consequences.

■ Upon these findings that the government's intended use of testimony about statements made by Terry Nichols to FBI agents would deny Timothy McVeigh his right to confront all witnesses against him under the Sixth Amendment to the United States Constitution, and that a joint trial of these defendants presents such an unacceptable risk of prejudice to both of them as to require separate trials, it is now

ORDERED that the defendants' motions for severance are granted to the extent that the trials of the charges as to each defendant will be conducted separately, and it is

FURTHER ORDERED that the first named defendant, Timothy McVeigh, will be tried first, and it is

FURTHER ORDERED that all pre-trial proceedings and motions hearings, unless otherwise expressly ordered, shall continue to be heard jointly.

*APPENDIX*

## LIMITING INSTRUCTION AT TIME OF WITNESS TESTIMONY

This case is really two trials in one. In one case you are asked to judge whether the government has proven beyond a reasonable doubt that Timothy McVeigh is guilty of each of the charges in the indictment. In the other case you are asked to decide whether the government has proven beyond a reasonable doubt that Terry Lynn Nichols is guilty of each of the charges in the indictment. Obviously, both men are here on trial together, but you must give separate consideration to each of them just as you would if they were being tried separately.

Thus far, all [most] of the evidence you have heard has been admissible against both defendants. You may consider that evidence when you separately consider the proof against each defendant. That is about to change. The next witness will testify about statements Mr. Nichols allegedly made to the FBI. This witness's testimony is not admissible against Mr. McVeigh. You must limit consideration of this witness's testimony to Mr. Nichols.

Under no circumstances may you consider this witness's testimony in the case against Mr. McVeigh. If Mr. McVeigh were being tried separately, this evidence could not be offered. A jury at a separate trial for Mr. McVeigh would not even hear this evidence. You will hear the evidence of course, but you must totally ignore it when you consider the evidence against Mr. McVeigh. Indeed, because this testimony cannot be considered evidence against Mr. McVeigh, his counsel will not even need to cross-examine this next witness.

You may consider Mr. Nichols' statements to the FBI only as evidence of his own activities and his personal knowledge and state of mind. I anticipate that the government may ask you to find that certain of Mr. Nichols' statements were true but that others were false and that the alleged falsity suggests a consciousness of guilt on Mr. Nichols' part. Whether or not there is evidence of false statements, whether any such

*APPENDIX*—Continued

evidence points to a consciousness of guilt, and the significance, if any, to be attached to such evidence, are matters exclusively within the province of the jury as the sole judges of the facts of this case. I caution you, however, that consciousness of guilt, if any, is based on personal knowledge and circumstances. Any testimony concerning a false exculpatory statement by Mr. Nichols is in no way attributable to Mr. McVeigh and may not be considered by you in determining whether the government has proven the charges against Mr. McVeigh beyond a reasonable doubt.

I repeat that under no circumstances are you to consider Mr. Nichols' FBI statements, whether you find them to be true or false, in your deliberations against Mr. McVeigh. Consideration of those statements in the case against Mr. McVeigh would violate not only Mr. McVeigh's constitutional rights but also your oaths and responsibilities as jurors. (Footnotes omitted.)

Limiting Instruction At Close of Case

[Repeat the essence of the charge proposed above and add the following.]

As a matter of law, you may not consider the testimony about Mr. Nichols' statements to the FBI agents in your deliberations about Mr. McVeigh. There is one obvious way for you to conduct your deliberations to make it easier for you to abide by that rule. That is to deliberate first as to whether the government has proved its case against Mr. McVeigh beyond a reasonable doubt. In this part of your deliberations, you could consider evidence admitted against Mr. McVeigh, but you could not consider in any way the evidence about Mr. Nichols' statements to the FBI agents. Once you conclude your deliberations as to Mr. McVeigh, you could then consider the charges against Mr. Nichols. In that part of your deliberations, and only in that part, you could consider the evidence of Mr. Nichols' statements to the FBI agents.

This is only a suggestion about the order in which you consider the charges against the defendants; you are free to structure your deliberations as you think best. But whatever order you decide to use in considering the

*APPENDIX*—Continued

charges, you must not rely in any way on the evidence of Mr. Nichols' statements to the FBI agents in deciding whether the government has proved the charges against Mr. McVeigh beyond a reasonable doubt.