UNITED STATES of America

v.

Henry G. CISNEROS, et al., Defendants.

Crim. Action No. 97–0485(SS).

United States District Court, District of Columbia.

June 19, 1998.

Mathew S. Rosengart, Mark V. Jackowski, Senior Associate Independent Counsel, Office of Independent Counsel, Washington, DC, for U.S.

Brendan Vincent Sullivan, Jr., Williams & Connolly, Washington, DC, Marcie Robin Ziegler, Washington, DC, for Henry G. Cisneros, Defendant.

Roger Mark Adelman, Washington, DC, for Linda D. Medlar, Defendant.

Abbe David Lowell, Brand, Lowell & Ryan, Washington, DC, for Sylvia Arce–Garcia, Defendant.

Jeffrey Gans, Steptoe & Johnson, L.L.P., Washington, DC, for John D. Rosales, Defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on: (1) Defendants Henry G. Cisneros, Linda D. Medlar,[1] Sylvia Arce–Garcia, and John Rosales' motions for severance; (2) Defendant Cisneros' motion for severance of counts 19–21 of the indictment, (3) Defendant Cisneros' motion to dismiss the indictment for lack of prosecutorial authority; (4) Defendant Cisneros' motion to disqualify certain United States counsel because they are fact witnesses; and (5) Defendant Cisneros' motion for discovery.

1. Linda D. Medlar now goes by her maiden name "Linda D. Jones." At the time of the Indictment, and throughout the period of the

## I. FACTUAL BACKGROUND

On December 11, 1997, a grand jury returned a twenty-one count Indictment against Defendants Henry G. Cisneros, Linda D. Medlar, Sylvia Arce–Garcia, and John D. Rosales alleging that the Defendants engaged in a conspiracy to withhold information from, and make false statements to, various governmental entities in an effort to ensure that Cisneros would be nominated and confirmed as the Secretary of Housing and Urban Development ("HUD"). Cisneros is the former Secretary of Housing and Urban Development ("HUD"), who served from January 1993 to January 1997. Medlar is a former campaign fundraiser for Cisneros who allegedly engaged in an extramarital affair with Cisneros and then allegedly blackmailed him in order to keep the details of the affair secret. Arce–Garcia and Rosales are both former employees of Cisneros Communications in San Antonio, Texas, who later became personal assistants to Cisneros during his tenure at HUD. The alleged false statements and acts of concealment relate primarily to payments Cisneros allegedly made to Medlar between 1989 and January 1994.

To support the charges brought against the Defendants, the Indictment alleges the following facts:

From May 1981 to May 1989, Cisneros served as the Mayor of San Antonio. During that period, he met Linda Medlar, who began working for him as a fundraiser. In March 1987, Cisneros and Medlar, both of whom were married to others, became romantically involved. Beginning in 1989 and continuing through January 1994, Cisneros made numerous payments to Medlar, ranging from approximately $2,500 to $15,000. The total amount of the payments exceeded $250,000. The payments were made in cash, by wire transfer, and by direct deposits into Medlar's bank accounts.

On December 17, 1992, President-elect Clinton publicly announced his intention to nominate Cisneros as the Secretary of the

alleged conspiracy, she went by the name of Linda D. Medlar. For the sake of clarity, this Court will refer to her as Linda Medlar.

United States Department of Housing and Urban Development ("HUD"). Because Cisneros was a potential nominee, the FBI began an investigation of Cisneros pursuant to the Memorandum of Understanding ("MOU") between the FBI and the Clinton–Gore Transition Team. The Clinton–Gore Transition Team screened high-ranking potential nominees of the President-elect in order to ensure that they were suitable to serve in the Clinton Administration. Under the MOU, the FBI was to conduct background investigations of the Clinton Administration's potential nominees at the request of the President-elect.

Cisneros allegedly paid Medlar before, during, and after he was nominated and confirmed as Secretary of HUD (from late summer 1992 to early 1994) in order to ensure her public silence about the extramarital affair and his previous payments to her. Cisneros directed Arce–Garcia and Rosales to conceal information from the FBI, the DOJ Security Office, and the United States Senate about his relationship with, and payments to, Medlar. In return, Cisneros promised Arce–Garcia and Rosales jobs on his staff at HUD.

On December 7, 1992, Cisneros completed and executed a Questionnaire for Sensitive Positions for National Security, commonly referred to as a Standard Form 86 ("SF–86"). On December 14, 1992, Cisneros executed a supplement to the SF–86. On Question 10S of the supplement, which asked whether there was anything in his personal life that could be used by someone to coerce or blackmail him, Cisneros answered that there was no basis upon which he be subject to coercion or blackmail.

On December 30, 1992, a special agent of the FBI interviewed Cisneros in Washington, D.C. as part of the FBI background investigation of him. Cisneros stated that the SF–86 and the supplement were accurate and correct. He declared to the agent that he was unaware of anything that could be used to coerce or compromise him if he were to be nominated and confirmed as Secretary of HUD. According to the Indictment, Cisneros concealed from the FBI the following facts: that Medlar

had threatened to go public about their relationship and about his payments to her; that he was, in fact, making payments to Medlar; and that despite making payments to Medlar substantially in excess of $10,000 per year since 1990, he had not filed informational Gift Tax Returns with the IRS.

On January 7, 1993, special agents of the FBI again interviewed Cisneros in Washington. D.C. because it came to the FBI's attention that Cisneros may have made payments to Medlar. When confronted with this information, Cisneros explained that the payments made to Medlar were not "hush money" payments and that he was no longer making any payments to Medlar. He stated that the highest single payment he made to Medlar was approximately $2,500; that the total payments he made to Medlar never exceeded $10,000 per year; that Medlar had never blackmailed him; and that he had not engaged in any substantial discussions with Medlar since early 1991. He failed to disclose that he had directed Arce–Garcia and Rosales to conceal information regarding his relationship with and payments to Medlar.

On January 13, 1993, Cisneros was formally appointed and confirmed as Secretary of HUD. As Secretary, Cisneros was the senior official in charge of the Department of Housing and Urban Development, a member of President Clinton's Cabinet, and twelfth in line to succeed the President of the United States, should it ever have become necessary.

On July 29, 1994, Medlar filed a lawsuit against Cisneros in Lubbock County, Texas, seeking damages for breach of contract and fraud, allegedly arising from his promise to support her financially. That same day, Cisneros issued a press release acknowledging that he had once been romantically involved with Medlar and that he had assisted her financially for several years. On September 12, 1994, Medlar appeared on a broadcast of the television program *Inside Edition.* During the program, Medlar asserted, among other things, that Cisneros had lied to the FBI during the course of its background inves-

tigation about the payments that he had made to her. On air, Medlar produced a deposit slip of a payment made by Cisneros to her in the amount of $4,500, an amount larger than the $2,500 figure that Cisneros had told the FBI was the largest single payment he had ever made to her. *Inside Edition* also broadcasted excerpts from conversations between Cisneros and Medlar that she had secretly recorded.

In September, 1994, as a result of the allegations made by Medlar on *Inside Edition*, United States Attorney General Janet Reno, as authorized by the Independent Counsel Reauthorization Act of 1994, 28 U.S.C. § 592, *et seq.* (1998), began an inquiry into whether Cisneros had lied to the FBI. As directed by Reno, special agents of the FBI interviewed Medlar in Lubbock, Texas on September 28 and 29, 1994. The Indictment alleges that during these interviews, Medlar claimed to be turning over to the FBI the original cassette tapes of her conversations with Cisneros and others. The tapes she provided, however, were not the originals.

In September 1994, the Internal Revenue Service ("IRS") also initiated an investigation of Cisneros because of the size of the payments he made to Medlar. On October 14, 1994, the Department of Justice ("DOJ") began a preliminary investigation, which concluded on March 13, 1995. That day, Attorney General Reno filed an application under 28 U.S.C. § 592(c)(1) (1998) to a Special Division of the United States Court of Appeals for the District of Columbia Circuit for the appointment of an Independent Counsel to investigate, and, if appropriate, to prosecute allegations concerning, among other things, Cisneros' alleged false statements to the FBI regarding the payments he made to Medlar. On May 24, 1995, the Special Division appointed David M. Barrett as Independent Counsel.

On October 31, 1995, a federal grand jury began investigating whether Cisneros committed violations of federal criminal law by making, or conspiring with others to make, false statements to the FBI during the course of its background investigation of him.

On November 27 and 28, 1995, Medlar entered into an immunity agreement with the Office of the Independent Counsel. Under the terms of the agreement, Medlar agreed to waive her Fifth Amendment constitutional right against self-incrimination; to provide truthful, full, and complete information to the Independent Counsel and to law enforcement personnel, including the FBI; to answer truthfully and completely all questions concerning the subject matter of the Independent Counsel's investigation; and not to attempt to protect or implicate anyone through false information or omissions. During an interview in the District of Columbia, Medlar violated the terms of this agreement by falsely advising special agents of the FBI that she provided the original tapes of her conversations with Cisneros and others to the IRS on May 31, 1995.

On December 11, 1997, the grand jury returned a twenty-one count Indictment against Defendants Cisneros, Medlar, Arce–Garcia, and Rosales. Count 1 of the Indictment charges all four Defendants with conspiracy to defraud the United States and conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371 (1998). From the summer of 1992 through on or about September 12, 1994, Count 1 alleges that all four Defendants conspired to defraud the United States by impeding the lawful government functions of: (a) the United States Senate in its confirmation process; (b) the FBI in conducting its background check; and (c) the Department of Justice ("DOJ") personnel security office in screening Cisneros for a national security clearance and in vetting him for a cabinet position in President Clinton's administration.

Count 1 of the Indictment further alleges that all four Defendants conspired to commit offenses against the United States by obstructing inquiries of the United States Congress in violation of 18 U.S.C. § 1505 (1998); obstructing the proceeding conducted by the DOJ in violation of 18 U.S.C. § 1505 (1998); making false statements and concealing material information from government agencies in violation of 18 U.S.C. § 1001 (1998); and

structuring and assisting transactions with a financial institution to evade the financial reporting requirements of 31 U.S.C. § 5313(a) in violation of 31 U.S.C. § 5324 (1998).

Counts 2, 3, 4, 5, 10, 11, 12, 14, 15, and 16 allege that Defendant Cisneros made various false, fictitious, and fraudulent statements and representations in violation of 18 U.S.C. § 1001 (1998). Counts 6, 7, 8, 9, 13, and 17 allege that Defendant Cisneros engaged in various attempts to conceal and cover up material facts relating to his payments to Defendant Medlar. Count 18 alleges that Defendant Cisneros engaged in obstruction of justice in violation of 18 U.S.C. § 1505 (1998). Counts 19 and 20 allege that Defendant Rosales made false, fictitious, and fraudulent statements and representations regarding his knowledge of Defendant Cisneros' payments to Defendant Medlar in violation of 18 U.S.C. § 1001 (1998). Finally, Count 21 alleges that Defendant Medlar made false, fictitious, and fraudulent statements and representations in violation of 18 U.S.C. § 1001 (1998) by stating in an FBI interview that she provided the IRS with original tapes of her recorded conversations with Cisneros when, in fact, the tapes were copies.

## II. ANALYSIS AND DECISION

### A. Severance

■ Defendants Cisneros, Medlar, Arce–Garcia, and Rosales move this Court to sever their joint trial under Fed.R.Crim.P. 14. Each Defendant requests a separate trial. At the hearing held on June 8, 1998, the Government joined in the motion to sever Medlar from Cisneros. Since it has now been agreed to by Cisneros, Medlar, and the Government, this Court will grant the motion.

■ As to Rosales and Arce–Garcia, this Court will not grant their motions to sever from Cisneros. Rosales and Arce–Garcia claim that since their roles in the alleged conspiracy were significantly less than Cisneros', there would be a significant "spillover" of prejudicial evidence pertaining only to Cisneros. They contend that a jury would likely hold such evidence against them, and

find them guilty merely by virtue of their association with Cisneros.

■ In general, it is preferred for Defendants who are named in the same Indictment to be tried jointly. See Zafiro v. United States, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). However, FedR. Crim.P. 14 provides, in pertinent part, that:

[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Rule 14 provides the Court with "great latitude to sever defendants." United States v. Brown, 16 F.3d 423, 432 (D.C.Cir.1994). "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." Zafiro v. United States, 506 U.S. 534, 541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "Ruling on a Rule 14 motion before trial requires the trial judge to anticipate the evidence and events of a future trial. The presumed benefits of a joint trial must be weighed against the potential for harm to the integrity of the trial process." United States v. McVeigh et al., 169 F.R.D. 362, 364 (D.Colo.1996).

■ As the Supreme Court has held, "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the Defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Since the "risk of prejudice will vary with the facts in each case," see Zafiro, 506 U.S. at 539, 113 S.Ct. 933, the decision to sever must be made on a case by case basis.

At this stage of the proceedings, the Court does not find that trying Rosales and Arce–Garcia along with Cisneros will present a "serious risk" to a specific trial right. Zafiro, 506 U.S. at 539, 113 S.Ct. 933. "[I]t is well settled that defendants are not entitled

to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro,* 506 U.S. at 540, 113 S.Ct. 933. With the appropriate instructions, the jury will be able to consider the guilt or innocence of each co-defendant independently. The Court does not find that either Arce–Garcia or Rosales will be unfairly implicated by spillover evidence relating only to Cisneros' actions.

■ Defendant Arce–Garcia makes the additional argument that a joint trial will deprive her of the ability to present exculpatory evidence. The Indictment alleges that Cisneros directed Arce–Garcia to conceal information about Cisneros' relationship with and payments to Medlar. She claims that Cisneros alone could directly exculpate her. If tried separately after Cisneros, Cisneros could testify that he never directed her to conceal information in return for a position on his staff. However, her claim fails to meet the test for severance on those grounds as set forth in *United States v. Ford,* 870 F.2d 729 (D.C.Cir.1989). In order to determine whether a defendant has established a prima facie case on the ground of the necessity of securing the testimony of a codefendant, Arce–Garcia must prove: "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed." *Id.* at 731. If the defendant fails to meet this threshold, severance is not required. Only if the defendant makes an adequate showing must the trial Court then: "(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion." *Id.*

In this case, Arce–Garcia has failed to meet the threshold showing. Specifically, she has not established the third and fourth elements as set forth in *Ford:* the exculpatory nature and effect of the testimony and the likelihood that Cisneros will testify if the cases are severed. The facts of *Ford* illustrate this point. In an alleged drug conspir-

acy, one defendant requested severance, claiming that the co-defendant, if severed, would testify that the defendant "had nothing to do with the transaction." *Id.* at 732. The Court of Appeals held that the defendant failed to establish the exculpatory nature and effect of the testimony because it represented "an assertion of ultimate fact." *Id.* The court held that the a defendant's showing of proof "demands more than conclusory statements by counsel; rather, the showing must be sufficiently definite in nature to allow the court reasonably to conclude that the testimony would in fact be 'substantially exculpatory.'" *Id.* In this case, like *Ford,* Arce–Garcia has made only the bare assertion that Cisneros would testify that she had nothing to do with the alleged conspiracy. This assertion clearly lacks the detail and specificity required by *Ford.* Further, at the June 9, 1998 hearing on Arce–Garcia's motion, the Government made a statement which the Court assumes was made in good faith that the Government had direct and circumstantial evidence, independent of any statement by Cisneros, to prove the allegations made against Arce–Garcia.

In addition, Arce–Garcia has failed to establish that there is a reasonable probability that Cisneros would testify at her trial. She has offered no evidence to this Court to suggest that Cisneros would testify on her behalf. The mere assertion that Cisneros might testify on her behalf is insufficient; it fails to meet the threshold requirement of *Ford* to compel further consideration of severance.

### B. Severance of Counts 19–21 of the Indictment

Cisneros moves the Court to sever Counts 19–21 from the Indictment. Cisneros claims that Counts 19–21 allege Rosales and Medlar made false statements in connection with criminal investigations after the conclusion of the conspiracy alleged in Count 1. Since the Court has granted the motion to sever Medlar from Cisneros, the Court will grant Cisneros' motion to sever Count 21 which relates solely to Medlar. As to Counts 19 and 20, which pertain to the post-conspiracy conduct of Rosales alone, this Court will deny the motion to sever. Count 19 alleges that

Defendant Rosales falsely stated in a February 13, 1995 interview with the IRS that he never knew about Cisneros' payments to Medlar. Count 20 alleges that Defendant Rosales made the same false statement in an August 21, 1996 interview with the ·FBI. Cisneros contends that since these alleged statements which form the basis for Counts 19 and 20 were made after the conclusion of the conspiracy alleged in Count 1, they must be severed under Fed.R.Crim.P. 8(b), or, in the alternative, under Fed.R.Crim.P. 14.

### 1.  Misjoinder Under Fed.R.Crim.P. 8(b)

▮ Fed.R.Crim.P. 8(b)[2] provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated *in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.* Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count (emphasis added).

A group of offenses forms a "series" only if the indictment alleges or the Government shows before trial that they are part of a "common scheme or plan" and that each defendant participated in some way in that common scheme or plan. *United States v. Johnson,* 46 F.3d 1166, 1172 (D.C.Cir.1995). "[J]oinder is proper so long as the government presents evidence before trial that defendants' offenses arose out of the same scheme." *United States v. Johnson,* 46 F.3d at 1172. Unlike discretionary severance under Fed.R.Crim.P. 14, the trial court must sever if there has been misjoinder under Fed.R.Crim.P. 8(b). *See United States v. Jackson,* 562 F.2d 789, 797 n. 10 (D.C.Cir. 1991).

▮ The crux of Cisneros' motion is that the post-conspiracy counts (Counts 19 and 20) are not part of the alleged common scheme or plan of Count 1 (the conspiracy count) because these counts are not charged as overt acts of the conspiracy alleged in Count 1. In support of his position, Cisneros relies heavily on the Court of Appeals' decision in *Cupo v. United States,* 359 F.2d 990 (D.C.Cir.1966). *Cupo* involved six defendants charged with conspiring to purchase merchandise on credit from stores by lying about their employment and then returning the merchandise for cash. Two of the defendants were also charged with automobile fraud which occurred before the conspiracy. The Court of Appeals held that it was improper to join the automobile fraud with the merchandise conspiracy because they were unrelated. *See id.* at 993. According to Cisneros, *Cupo* suggests that to be part of a common scheme or plan, each act must be an overt act in furtherance of the conspiracy. *See* Motion of Defendant Cisneros to Sever Counts 19-21, at 7 ("Because the automobile counts were not charged as overt acts in furtherance of the conspiracy and did not occur during the conspiracy, the D.C. Circuit concluded that the automobile counts were improperly joined.").

▮ However, contrary to Cisneros' interpretation of *Cupo,* the issue of whether or not each act constitutes an overt act of the conspiracy is not the dispositive question. Offenses need not be part of the conspiracy to be joined under Fed.R.Crim.P. 8(b). Rather, the dispositive test is whether or not the offenses "arose out of" a common plan or scheme, *see United States v. Johnson,* 46 F.3d 1166, 1172 (D.C.Cir.1995), not whether the offenses were overt acts of the conspiracy or committed during the course of the conspiracy. "It is sufficient that [a codefendant] participate[s] in some way in the series of transactions that link the counts, and not necessarily in each act that makes up the series." *Id.* at 1172. "[A]ll defendants need not be charged in each count." *Id.* In *Cupo,* the fact that the automobile fraud was not charged as an overt act was merely one factor in the Court's analysis of whether or not the offense arose out of a common scheme. The fact that the automobile fraud

**2.**  Fed.R.Crim.P. 8(a) governs the joinder of offenses, while Fed.R.Crim.P. 8(b) governs the joinder of defendants. Since this Circuit has held that Rule 8(b) provides the standard "for determining the permissibility of joinder of offenses when more than one defendant is involved." *United States v. Jackson,* 562 F.2d 789. 793 (D.C.Cir.1977), Rule 8(b) is the relevant rule for consideration in this case.

occurred before the conception of the merchandise fraud conspiracy illustrates that it was not part of the merchandise fraud scheme. Although the offenses in *Cupo* were similar in that they all involved fraud, they were unrelated because there was no other connection between them.

In this case, Count 1 of the Indictment alleges a scheme among all four defendants to cover-up details about Cisneros affair with Medlar and about his payments to her. Counts 19 and 20 relate directly to that scheme. These counts allege that Rosales acted to conceal the details of Cisneros' relationship with, and payments to, Medlar. Although Rosales' acts as charged in Counts 19 and 20 are not charged as overt acts of the conspiracy, they still were clearly connected to the common scheme. Accordingly, the Court finds that joinder of Counts 19 and 20 is proper in this case.

### 2. Severance Under Fed.P.Crim.P. 14

In the alternative, Defendant Cisneros argues that even if severance is not required under Fed.R.Crim.P. 8(b), it is still required under Fed.R.Crim.P. 14, which provides that the Court may grant severance if "it appears that a defendant or the government is prejudiced by a joinder." Under Rule 14, Cisneros must demonstrate that "there is a serious risk that a joint trial would compromise a specific trial right ... or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

▮▮▮ Cisneros argues that there is a danger that evidence admissible only against Rosales will have a "spillover" effect that could lead a jury to attribute it against Cisneros. The Court, however, finds that any "spillover" effect of evidence admissible only against Rosales will be minimal. Only two of twenty-one counts relate to Rosales alone. Accordingly, there should be no "serious risk" to any of Cisneros' trial rights. Any possible spillover can be cured with a sharply worded limiting instruction. Balancing the slight risk of prejudice to Cisneros against the significant benefits of trying Cisneros jointly with Rosales, the Court concludes that the scales tip heavily in favor of a joint trial. The benefits of a joint trial are quite substantial. Joint trials "play a vital role in the criminal justice system." *Richardson v. Marsh,* 481 U.S. 200, 209, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The Supreme Court reasoned that

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. *Richardson,* 481 U.S. at 210, 107 S.Ct. 1702.

Forcing the Government in this case to try Cisneros separately from Rosales would place a great burden on the Government, one that is clearly unwarranted given the very minimal risk of prejudice to Cisneros.

### C. Prosecutorial Authority

Defendant Cisneros moves the Court to dismiss the Indictment for lack of prosecutorial authority. Cisneros claims that Independent Counsel David M. Barrett was not appointed in accordance with the Appointments Clause of the United States Constitution. The Independent Counsel was appointed by the Division of the United States Court of Appeals for the District of Columbia Circuit for the Purpose of Appointing Independent Counsels ("Special Division"). In his motion, Cisneros claims that the Special Division is not the proper appointing entity under the Appointments Clause. As a result, the Independent Counsel had no constitutional authority to obtain the Indictment.

The Special Division in this case was established under the Ethics In Government Act of 1978, 28 U.S.C. § 49, 591 *et seq.* (1998). The Act provides that three judges shall be assigned for a two-year period from the United States Court of Appeals for the District of Columbia to serve as a "division of the court for the purpose of appointing independent counsels." 28 U.S.C. § 49 (1998).

The Appointments Clause of Article II of the Constitution provides that: "the Congress may by Law vest the Appointment of such inferior officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. As decided by the Supreme Court in the seminal case, *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), an Independent Counsel is an "inferior officer" within the meaning of the Appointments Clause. *See id.* at 672, 108 S.Ct. 2597.

Cisneros claims that the Special Division is not a court of law within the meaning of the Appointments Clause. The test to determine whether an entity is a court of law is whether its "function and role in the federal scheme closely resemble" those of courts that are "indisputably" courts of law. *Freytag v. Commission of Internal Revenue*, 501 U.S. 868, 891, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). Cisneros claims that the Special Division does not meet the *Freytag* test for a court of law. He argues that the Special Division does not perform any function traditionally associated with a court of law. According to Cisneros, the Special Division is a non-adjudicatory body with no function other than to appoint and define the jurisdiction of independent counsels, serve as a repository for certain documents, and award attorneys' fees to unindicted subjects of investigations.

The Court will not conduct its own independent analysis of whether the Special Division is a court of law under *Freytag* because the Supreme Court has already spoken on the issue. In *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) the Supreme Court concluded that the "provisions of the [Ethics in Government Act] do not violate the Appointments Clause of the Constitution." *Morrison*, 487 U.S. at 659–60, 108 S.Ct. 2597. Although Cisneros claims that *Morrison* did not reach the issue of whether a Special Division is a court of law under the Appointments Clause, this Court finds that Cisneros' reading of *Morrison* is far too narrow. While the Court did not explicitly state that the Special Division is a court of law, the Court could not have reached its conclusion that the Ethics in Government Act was constitutional without implicitly determining that the Special Division was a proper appointing entity under the Appointments Clause. Cisneros' argument has been raised several times before other judges on this District Court, and all have reached the same conclusion. *See United States v. North*, 708 F.Supp. 387, 388–89 (D.D.C.1988) ("*Morrison* assumed the Division was within the Judicial Branch, and found no problem with interbranch appointments."); *United States v. Clarridge*, 811 F.Supp. 697, 701 (D.D.C.1992) ("[T]he Special Division was a 'court of law.' ").

Cisneros also argues that 28 U.S.C. § 594(c) (1998), which grants the Independent Counsel the authority to appoint attorneys to assist him, is unconstitutional. Title 28 U.S.C. § 594(c) (1998) provides: "For the purpose of carrying out the duties of an office of independent counsel, such independent counsel may appoint, fix the compensation, and assign the duties of such employees as such independent counsel considers necessary (including investigators, attorneys, and part-time consultants)." Cisneros claims that the Deputy and Associates of the Independent Counsel are "inferior officers," who must be appointed by the President, courts of law, or heads of departments.

This Court finds that the Deputy and Associates of the Independent Counsel are not "inferior officers." They are "employees" of the United States and, as a result, do not need to be appointed in accordance with the Appointments Clause. According to the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), an "officer" is "any appointee exercising significant authority pursuant to the laws of the United States." In contrast, "[e]mployees are lesser functionaries subordinate to officers of the United States." Id at 126 n. 162, 96 S.Ct. 612. The operative distinction between an officer and an employee concerns the nature and scope of their authority.

To determine the scope of an official's authority, courts look to the federal statutes which define that authority. This

Circuit has emphasized that an "officer" obtains his or her authority from a federal statute. *Citizens for the Abatement of Aircraft Noise, Inc. v. Metropolitan Washington Airports Authority,* 917 F.2d 48, 54 (D.C.Cir. 1990). While determining the nature of power exercised by a review board, the Court of Appeals in *Citizens* interpreted *Buckley*'s definition of "officers" to require statutes creating offices to define them with specificity as to their "composition and authority." Id at 54. In this case, 28 U.S.C. § 594 does not specifically define the duties of the Independent Counsel's subordinates nor does it address the "composition and authority" of the offices of Deputy and Associate Independent Counsels. Instead, the statute merely authorizes the Independent Counsel to hire additional "employees" and assign duties to them as he or she sees fit. Therefore, this case does not include an office that is statutorily created and defined.

Cisneros further claims that the Associate Independent Counsels and the Deputy Independent Counsel have nearly the same authority as the Independent Counsel in this case. In *United States v. Clarridge,* Judge Greene of this District Court held that an assistant to the Independent Counsel was not an "officer" primarily because the Independent Counsel "retain[ed] ultimate authority over indictments and plea bargains." 811 F.Supp. 697, 701 n. 4 (D.D.C.1992). In this instance, the Deputy and Associate Independent Counsels preside over much of the trial and the investigation, yet the ultimate prosecutorial decisions still rest with the Independent Counsel himself.

Because 28 U.S.C. § 594(c) fails to grant the Independent Counsel's subordinates "significant authority pursuant to the laws of the United States," the Deputy and Associate Independent Counsels participating in this case are not "inferior officers" but "employees" of the Independent Counsel. *See In re Sealed Case,* 665 F.Supp. 56, 59 n. 3 (D.D.C. 1987) ("it is clear that the attorneys on [the Independent Counsel's] staff are not officers at all but employees of the United States"); *United States v. North,* 708 F.Supp. 370 (D.D.C.1988) (the court declared "meritless" the defendant's argument that Associate In-

dependent Counsel was unconstitutionally appointed); and *United States v. North,* 716 F.Supp. 644 (D.D.C.1989) (Associate Independent Counsels "were authorized to represent the United States, having been appointed by [the] Independent Counsel").

### D. Motion to Disqualify Certain U.S. Counsel

Defendant Cisneros moves to disqualify certain prosecutors in the Office of the Independent Counsel because they were witnesses to potentially incriminating statements made by Medlar. Because the Government has agreed to try Medlar separately, it is conceded by all the relevant parties that this motion is now moot.

### E. Discovery

Defendants Cisneros, Rosales, and Arce-Garcia moves the Court for discovery. By June 30, 1998, the Independent Counsel will provide the Court with a sworn affidavit that the Independent Counsel has fully complied with Fed.R.Crim.P. 16.