[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION AND JUDGMENT ENTRY
This case is before the court on appeal from the Lucas County Court of Common Pleas. Appellant was tried jointly with a codefendant in one trial using two juries — one for appellant and one for his codefendant. The jury assigned to appellant's case found him guilty of aggravated robbery and murder, with gun specifications for both, arising from appellant's participation in the death of a person from whom he purchased drugs.
Appellant asserts the following assignments of error:
 "I. THE TRIAL COURT'S ADMISSION OF INCULPATORY STATEMENTS MADE SHORTLY AFTER DEFENDANT-APPELLANT'S ATTEMPTED SUICIDE IS CONTRARY TO LAW AND AN ABUSE OF DISCRETION.
 "II. THE TRIAL COURT'S SUA SPONTE ORDER DIRECTING THAT DEFENDANT-APPELLANT AND HIS CO-DEFENDANT BE TRIED TO DUAL JURIES IN ONE PROCEEDING WAS AN ABUSE OF DISCRETION AND CONTRARY TO BRUTON V. UNITED STATES.
 "III. DEFENDANT-APPELLANT'S TRIAL COUNSEL WAS SO INEFFECTIVE THAT THE RESULT OF THE TRIAL CANNOT BE RELIED UPON TO HAVE PRODUCED A JUST RESULT.
 "IV. THE ADMISSION INTO EVIDENCE OF THE AUDIO AND VIDEOTAPED STATEMENTS OF DEFENDANT-APPELLANT WAS CONTRARY TO LAW AND AN ABUSE OF DISCRETION.
 "V. DEFENDANT-APPELLANT'S CONVICTION IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL."
 "VI. THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION RELATIVE TO BOTH COUNTS IN THE INDICTMENT WHERE ELEMENTS NECESSARY TO EACH COUNT WERE NOT PROVEN BEYOND A REASONABLE DOUBT."
Appellant Chad VanHorn visited Tom Sharp at a motel at approximately 7:30 p.m. on January 5, 1998. Appellant purchased cocaine from Sharp as he had for approximately two years. After the transaction, Sharp accompanied appellant to the motel parking lot, where appellant's friends were waiting for him. Sharp and appellant exchanged words, and Sharp appeared angry. Appellant claimed that Sharp bragged that he was going to use a Tech-9 pistol to shoot a cousin who owed him money and boasted that he would shoot anyone, including appellant. Approximately ten hours later, appellant returned to the motel for more cocaine. Jeremy Burke, appellant's co-defendant, accompanied him to Sharp's motel room. Appellant brought a shotgun with him, which he covered with a white towel and carried behind his back into the motel.
Sharp's companion, Kelly Coppy, opened the door for the two men. When Sharp detected the shotgun, he demanded that appellant give it to him. Appellant handed it to Coppy who gave it to Sharp. Sharp returned the weapon to appellant, ordering him to unload it. Sharp's companion went into adjoining motel room. She testified that she did not like guns. Appellant claimed that while he was following Sharp's order, Sharp reached for something on a shelf near a door that connected that room to the adjoining room where Coppy had gone. According to Coppy, she heard Sharp say, "aw, you've gone and made her mad."
Appellant later admitted to police that he shot Sharp once because he thought Sharp was reaching for the Tech-9 gun. Forensic evidence suggested that the first shot wounded Sharp in his right forearm as he was passing through the doorway to the adjoining room. Appellant denied shooting a second time, claiming Burke fired the second shot. That shot wounded Sharp in the side in the lower abdominal area, shattering the hip bone. After Sharp's companion closed the door between the two rooms, appellant and Burke grabbed cocaine and the keys to Sharp's truck and fled the motel. A motel desk clerk observed them leaving. Because of a security device, Sharp's truck would not start. Police found the keys on the front seat.
Coppy contacted 911 immediately. Paramedics attempted to revive Sharp and transported him to a hospital. Sharp was pronounced dead from bleeding from severe internal injuries.At approximately 5:45 a.m., two men approached a man who was retrieving his newspaper from the front yard of his home near the motel. They asked to use his telephone because of car problems. The witness allowed them to use his cellular telephone to make a call. The witness testified that the two men, whom he identified through a photographic array and at trial as appellant and Burke, thanked him and left. At approximately 6:00 a.m., the owner of a heating and air conditioning company close to the motel allowed two men in to use the telephone. The owner identified appellant and his codefendant as the two men.
The person who had driven appellant and Burke to the motel responded to their pages. He picked them up and drove them to appellant's home. Appellant and Burke traveled to Indiana, where they obtained an acquaintance's car to drive to Florida. On January 9, 1998, Panama City, Florida police stopped the two after determining that the car they were driving had been reported stolen by the owner in Indiana. The two attempted to evade police by driving away at a high rate of speed. The two eventually fled on foot. The police located appellant hiding under a house, where he had used a syringe to attempt to inject himself with an air bubble.
Appellant was transported and admitted to a hospital for treatment at approximately 6:19 a.m. During the five minute ride, he became talkative and polite with the accompanying officer and asked questions, including about extradition procedures. He was released into the custody of police at approximately 7:30 a.m. The treating physician recommended that appellant be placed on a strict suicide watch and evaluated by a counselor.
Appellant was taken to the Panama City Police Department. At approximately 8:30 a.m., a Panama City detective began questioning appellant about the events in Toledo. Appellant completed and signed a waiver of Miranda rights at 8:45 a.m. The interview was tape recorded, and indicated the interview began at 9:20 a.m. Appellant acknowledged being at Sharp's motel room and having a shotgun.
Appellant and his codefendant returned to Lucas County, Ohio approximately one month later on February 5, 1998. A Toledo police detective interviewed appellant within three hours after his arrival after giving appellant Miranda warnings. Appellant waived those rights in writing. Appellant gave the detective a statement, which was videotaped. Appellant admitted firing the shotgun once at Sharp. He stated Burke fired the second shot. Appellant maintained that he thought Sharp was reaching for the V Tech-9 gun.
On February 6, appellant and Burke were jointly indicted for one count of aggravated robbery, in violation of R.C.2911.01(A)(1) and one count of murder, in violation of R.C.2903.02. The first was a felony of the first degree while the second was an unspecified felony. A firearm specification, as provided in R.C. 2941.145, was appended to each charge as well.On February 12, 1998, the trial court appointed an attorney to represent appellant. Although no transcript of the proceedings at that hearing were submitted on appeal, the record contains a document titled "Canon 3D Remittal of Disqualification." Appellant, his attorney, and the assistant prosecuting attorney signed that document, which stated in pertinent part:
 "Having become aware that there may be a perceived conflict for the above named Judge in this matter, that he is the husband of * * * [the] Lucas County Prosecuting Attorney, and independently of the Judge's participation in this case, it is hereby agreed that the perceived conflict of interest is immaterial and the Judge may participate in the proceedings."
Appellant entered not guilty pleas at the arraignment which followed.
On February 26, 1998, the trial court sua sponte ordered that potential cross-implicating statements made by the appellant and codefendant Burke required separate juries pursuant to Brutonv. United States (1968), 391 U.S. 123. The trial court ordered that both appellant and Burke be tried together in one trial, before two separate juries, on April 6, 1998.
On March 24, 1998, the trial court conducted a hearing on appellant's motion to suppress alleging that his statements to Toledo police were involuntary and photo arrays presented to three witnesses were suggestive. The trial court rejected appellant's argument that the identification procedure was impermissibly suggestive and determined that appellant knowingly and voluntarily waived his Miranda rights. After a second suppression hearing on April 6, 1998, the trial court determined that appellant's statements to the Florida police were made after he knowingly and voluntarily waived his Miranda rights. At the close of the hearing, the trial court outlined the procedure to be followed to use two separate juries for the single trial scheduled to begin later that day.
Voir dire of appellant's jury occurred separately from that of Burke's jury. Appellant's jury heard the opening statement presented by his attorney, but the Burke jury did not hear that opening statement. Likewise, appellant's jury did not hear the opening statement in Burke's case. Both juries were in the courtroom when evidence common to both cases was presented. When evidence of appellant's statements to police was presented, the Burke jury was excused. When evidence of Burke's statements to police was presented, appellant's jury was temporarily excused from the courtroom.
Appellee presented testimony from seventeen witnesses. The arresting officer and the interviewing detective from Panama City, Florida testified, as did the investigating detective and interviewing detective from Toledo. Appellant's statements to police officers during the interviews in Panama City and Toledo were played for the jury during the interviewing officers' testimony. The victim's companion, Kelly Coppy testified about the events surrounding the shootings. Two of the codefendants' friends who accompanied appellant to the motel on January 5 and January 6, 1998, also testified.
At the close of appellee's case, appellant asked the court for an acquittal on the aggravated robbery charge. The trial court denied the motion.
During appellee's request to admit over eighty exhibits, appellant's attorney objected to the admission of the tangible evidence of appellant's confessions to Panama City and Toledo police. In particular, appellant challenged transcripts of the tapes as incomplete. Appellant also protested allowing the jury to have access to the video and audio tapes during deliberations instead of relying on their collective memories of what had been played during trial. The trial court allowed the jury to use the audio tape and video taped statements in its deliberations. However, the court ordered that no listening or viewing equipment would be provided to the jury unless specifically requested, which they did.
The trial court instructed the jury on the offenses of murder and involuntary and voluntary manslaughter. It defined the crime of aggravated robbery in its instructions as well. During the instructions, and throughout the trial, the jury was cautioned not to discuss any matters with the other jury and not to speculate why two juries were involved in fulfilling their duties.
On April 9, 1998, the jury found appellant guilty of aggravated robbery and the associated gun specification. The jury also found appellant guilty of murder. Again, they found that a gun specification should apply to the murder offense.
On April 14, 1998, the trial court sentenced appellant to serve five years of incarceration for the aggravated robbery charge. The court imposed a mandatory prison term of fifteen years to life for the murder conviction. In addition, the court imposed the mandatory term of three years incarceration for the firearm specifications. The court ordered the sentences to be served consecutively.
In his first assignment of error, appellant contends that because a physician recommended that he be placed on a suicide watch at the jail approximately one hour before a Panama City police detective began questioning appellant, appellant was in a "precarious mental state". Appellant claims that "state" precluded his knowing, voluntary, and intelligent waiver of his right against self incrimination pursuant to Miranda v. Arizona
(1966), 384 U.S. 436.
Whether a confession is voluntary depends upon the totality of the circumstances, including the age and mentality of the accused; the nature of the interrogation; any physical or mental deprivation or mistreatment; and the existence of threat or inducement. See State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911; State v. Wiles (1991), 59 Ohio St.3d 71, 81, certiorari denied (1992) 506 U.S. 832.
The prosecution has the burden to prove that an accused understood his rights and knowingly, intelligently, and voluntarily waived his rights before giving inculpatory statements of his own free will to police officers. See State v.Jenkins (1984), 15 Ohio St.3d 164, 231, certiorari denied (1985),472 U.S. 1032. The court must determine whether the totality of the circumstances surrounding the interrogation demonstrates that the statements are of the accused's free and rational choice.Id. (citation omitted).
Here, appellant was medically determined to be well enough to be released from the hospital into the custody of police after brief treatment totaling approximately one hour. Certainly, that suggests that appellant's health was not jeopardized by being released to police officers. See State v. Daniels (Sep. 20, 1999), Stark App. No. 1998CA00273, unreported. That the hospital cautioned the jail to place appellant on suicide watch does not indicate that appellant was medically recognized to be in a "precarious mental state." That precaution did not indicate appellant lacked capacity to understand his legal rights or talk to police of his own free will. The interrogating officer testified at the suppression hearing that not only was appellant "nonchalant" and understanding of his circumstances, he cautiously answered the detective's questions and did not appear anything other than "normal." Even before being treated at the hospital, appellant was cogent enough to express concern about his future, including extradition.
The totality of the circumstances surrounding the interview at the Panama City police station as presented during the suppression hearing reveals that the trial court's decision to deny appellant's motion to suppress his confession was not against the preponderance of the evidence.
Accordingly, appellant's first assignment of error is found not well-taken.
In his second assignment of error, appellant challenges for the first time on appeal, the trial court's use of dual juries in one simultaneous trial of two codefendants. Appellant challenges the trial court's procedure in sua sponte ordering a trial of that nature as well as the substance of the trial court's order.
Appellant contends that such a procedure violates Bruton v.United States, (1968) 391 U.S. 123, 131, which prohibits admitting evidence of one defendant's statements implicating the other codefendant during their joint trial where the codefendant who confessed does not take the stand. Appellant admitted involvement in Sharp's death to the Florida and Toledo police. Appellant's codefendant, Burke, also admitted involvement. Each discussed the other's role, raising a classicBruton situation.
To alleviate that concern, the trial court sua sponte
ordered that it would impanel one jury for appellant and a second jury for codefendant Burke. In essence, the trial court used the dual jury trial as a form of severance by presenting a single trial to multiple juries, whereby each individual defendant would purportedly receive the same protection they would receive in separate trials. State v. Avery (Ct.App. 1997), 215 Wis.2d 45. Both appellant and his codefendant had been jointly indicted. "R.C. 2945.13 provides that when two or more persons are jointly indicted for a noncapital felony, they shall be tried jointly unless, following an application by the prosecutor or one of the defendants showing good cause, the trial court orders separate trials." State v. Carter, (May 21, 1999), Lucas App. Nos. L-97-1162, L-97-1163, and L-97-1169, unreported. See also Crim.R. 8 and 13 (trial court may order two or more indictments to be tried together); In re: Ricky E. (June 7, 1999), Sandusky App. S-95-035, unreported. In fact, Crim.R. 14, which restates theBruton rule, directs:
 "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment * * *, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." See State v. Carter, supra.
The trial court's sua sponte order recognized that the joinder of defendants is the rule rather than the exception because the law favors avoiding multiple trials. State v. Carter,supra, citing State v. Thomas (1980), 61 Ohio St.2d 223, 224;State v. Roberts (1980), 62 Ohio St.2d 170, certiorari denied (1980), 449 U.S. 879. However, R.C. 2945.13 does not expressly authorize a trial court to order, on its own initiative, codefendants to be tried simultaneously by two different juries, a procedure some courts consider "partial or modified severance."State v. Padilla (Ct.App. 1998), 125 N.M. 665, 668; State v.Brockway (1998), 683 N.Y.S.2d 671, 672.
While the procedure is hybrid, it retains characteristics of one simultaneous, joint trial. Consequently, R.C. 2945.13
directs the trial court to try codefendants together unless one of the parties asks for severance. Since neither party asked the court to sever the trials, it is fundamental that the trial court may control its own docket and courtroom proceedings. Further, Crim.R. 13 allows a court to order, without motion by the state or a defendant, two or more indictments to be tried together if the offenses could have been indicted jointly. While the better method may be to insist that the parties request a novel procedure such as dual juries, the trial court did not abuse its discretion in its sua sponte order. Further, appellant never objected to the trial court's order. Thus, he waived any error arising from that decision. A motion for relief from prejudicial joinder must be timely raised and renewed at the close of the prosecutions's case or at the close of all of the evidence.State v. Carter, supra, citing State v. Owens (1975), 51 Ohio App.2d 132,146. Appellant waived any error arising from the trial court's sua sponte decision to order the codefendants to be tried concurrently to two different juries.
Appellant also suggests that, substantively, the trial court failed to consider that using two juries promotes "the possibility of jury speculation" about the procedure or whether one codefendant is more guilty, or should be treated differently, than the other. Neither party presented any authority from Ohio evaluating the propriety of using two juries simultaneously during one trial of codefendants. Courts in other jurisdictions, while often reluctantly approving using two juries in one simultaneous trial, have routinely rejected appellant's claim that the procedure is "inherently prejudicial." See State v.Padilla, 125 N.M. 665; State v. Avery, 215 Wis.2d at 53, n. 4;People v. Jackson (1996), 13 Cal.4th 1164.
 "Thus, in Bruton, the Supreme Court connected the Sixth Amendment right of confrontation and the necessity of severing defendants to the fact that `the confession is never deleted from the case.' * * * The Court, however, did not otherwise suggest that joint trials were inappropriate. Indeed, the Court acknowledged the value of joint trials, reiterating that they `do conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial. Logically therefore, if a confession could be `deleted from the case,' severance would not be required, or viewed somewhat differently, if the confession could be `deleted from the case,' severance would be accomplished. That is exactly what occurs when a defendant and codefendant are tried simultaneously before two juries, and the defendant's jury is excused from the courtroom so that it does not receive inadmissible evidence.' Id. Thus, the evidence before appellant's jury at the joint trial was the same as the evidence that would have been presented had appellant been tried alone." State v. Avery, 215 Wis.2d at 51-52 45; see State v. Padilla, 125 N.M. 665.
None of the decisions we reviewed found merit in appellant's particular claim that prejudice was inherent in subjecting jurors "to the unusual daily routine of being shuffled in for some testimony and being shuffled out for other testimony." Instead, those courts have required certain safeguards and relied upon the discretion of the trial court to determine whether courtroom facilities permitted dual juries. See United States v.McVeigh (D.Colo. 1996), 169 F.R.D. 362, 371.
Consequently, we agree with the majority of other jurisdictions which have concluded that the use of dual or simultaneous juries for two codefendants during one trial is not inherently prejudicial. Likewise, as long as adequate safeguards are in place, a trial court's decision to use dual juries will not be reversed absent an abuse of discretion.
Accordingly, appellant's second assignment of error is found not well-taken.
In his third assignment of error, appellant asserts that he was denied effective assistance of counsel. He contends that his trial attorney should not have allowed him to waive any claim of conflict of interest between the trial judge and the elected prosecutor. Appellant also contends his attorney was ineffective by failing to object to having one trial with two juries or renewing a motion to set aside the jury's verdict.The Supreme Court of Ohio defined how to apply the two-prong Strickland
standard to evaluate an ineffective assistance of counsel claim inState v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus; citing Strickland v. Washington (1984),466 U.S. 668. To prevail on a claim of ineffective assistance of counsel, appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. State v. Sallie
(1998), 81 Ohio St.3d 673, 674, citing State v. Reynolds (1998),80 Ohio St.3d 670, 674, certiorari denied (1998), 524 U.S. 930. Appellant must show counsel's conduct was objectively deficient by producing evidence that counsel acted unreasonably to meet the first prong of the Strickland test. Id., citing State v. Keith
(1997), 79 Ohio St.3d 514, 534. To establish the second prong, appellant must prove that but for counsel's errors, a reasonable probability exists that the result of the trial would have been different. "[T]rial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance", which includes sound trial strategy.Id. at 675 (citation omitted); see State v. Carter
(1995), 72 Ohio St.3d 545, 558, certiorari denied (1999) ___ U.S. ___, 114 L.Ed.2d 780.
Appellant first contends that his trial counsel ineffectively failed to object to the court's order for one trial with two juries. Other than concern about encouraging trial courts tosua sponte order such a procedure, we previously determined that there was no error in using two juries to reject appellant's second assignment of error. As a result, appellant's counsel could not have acted unreasonably by not challenging an acceptable trial procedure.
Appellant next asserts that his attorney failed to protect him from the appearance of impropriety and conflict arising from the fact that the trial judge was married to the elected prosecuting attorney for the same county. However, appellant signed a written waiver which expressly identified the potential for an appearance of impropriety and conflict of interest. Nonetheless, appellant elected to proceed with the judge initially assigned to the case. Certainly, appellant's attorney has an obligation to identify such conflicts to his client and advise him according. Here, however, the court itself notified appellant of those alleged conflicts in writing. Without a transcript of the proceedings, we have no ability to assess whether the trial court deprived appellant of an opportunity to discuss the conflict with his attorney and must presume the validity of the trial court's proceedings. Knapp v. Edwards Laboratories (1980), 61 Ohio St.2d 197,199. The decision to proceed before that judge or have the case assigned to another judge was appellant's alone. Consequently, we can find no ineffectiveness on counsel's part.
Finally, appellant argues that trial counsel should have asked the court to set aside the jury's conviction pursuant to Crim.R. 29 where the "manifest weight of the evidence" did not support the verdict. As will be explained in the next assignments of error, the evidence was sufficient to support the juries verdict, which in turn was supported by the manifest weight of the evidence. Accordingly, appellant's attorney's representation did not fall below an objective standard of reasonableness.
Appellant's third assignment of error is found not well-taken.
In his fourth assignment of error, appellant contends that the trial court erred as a matter of law and abused its discretion by admitting the recordings and transcripts of appellant's videotaped and audio taped statements into evidence. Appellant reasserts on appeal the argument raised to the trial court that the court should have required the jury to rely on its collective memories of the contents of those confessions played during the trial instead of being allowed to review them without restriction.
The Ohio Supreme Court has rejected appellant's argument.
 "[T]here is no error in allowing the jury to view or hear for a second time an exhibit [such as a taped interview with police] properly admitted into evidence. State v. Loza
(1994), 71 Ohio St.3d 61, 79-80; State v. Clark (1988), 38 Ohio St.3d 252, 257. Sending properly admitted evidence into jury deliberations rests within the sound discretion of the trial judge." State v. McGuire (1997), 80 Ohio St.3d 390, 396, certiorari denied (1998), 525 U.S. 831. (Emphasis added).
Here, the trial court admitted properly authenticated evidence. See State v. Gotsis (1984), 13 Ohio App.3d 282, 283; State v.Frazier (Dec. 22, 1989), Lucas App. No. L-89-017, unreported.Some courts which have recognized potential for prejudice arising from undue emphasis on a tape recording by repetitive playing do not allow the jury to have unrestricted control to a listening device. See State v. Frazier (1983), 99 Wn.2d 180. The trial court attempted to minimize prejudice to appellant by supervising the jury's access to the tapes by limiting their ability to use devices to review them. As a result, the trial court did not abuse its discretion by allowing the jury access to the taped interviews during deliberations.
Accordingly, appellant's fourth assignment of error is found not well taken.
Finally, appellant's fifth and six assignments of error are addressed together because both challenge the quality of the evidence supporting his conviction. Appellant claims that the verdict of conviction was contrary to the manifest weight of the evidence and not supported by sufficient evidence.
Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard we must use to review whether the manifest weight of the evidence sustains a conviction:
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."
Id. at 388, citing Tibbs v. Florida (1982), 457 U.S. 31, 42. To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Only if we conclude that the jury clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial. Id.
The concept of manifest weight of the evidence is distinguished from sufficiency of the evidence. State v. Jenks,61 Ohio St.3d 259. Sufficiency of the evidence is the legal standard to test whether the evidence introduced at trial is legally sufficient or adequate as a matter of law to support a verdict. State v. Thompkins, 78 Ohio St.3d at 388. "`The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.' State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia
(1979), 443 U.S. 307. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant." In the matter of: Jason H. (Jan. 14, 2000), Erie App. No. E-99-003, E-99-004, unreported.
Appellant was convicted of murder in violation of R.C.2903.02: "No person shall purposely cause the death of another * * *" A firearm specification pursuant to R.C. 2941.145 was appended to that charge. Appellant was also convicted of aggravated robbery with a firearm specification in violation of R.C. 2911.01(A)(1) and 2941.145. R.C. 2911.01(A)(1) states:
 "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicated that the offender possesses it, or use it * * *"
There was no question that appellant was involved in Sharp's death. The primary questions for the jury to decide were (1) the nature of appellant's intent in shooting Sharp, and whether it was murder or voluntary or involuntary manslaughter[1]; and (2) whether appellant used force to take the victim's possessions from the motel room.
Sharp's companion testified that she let appellant into the motel room and observed him with a shotgun. Although she had moved to another room and did not witness whether the victim was reaching for anything that might have been a gun, she found it necessary to close the door to prevent appellant from doing further harm.
One of appellant's friends testified that appellant cleaned the shotgun before going back to the motel the second time. Another friend testified that appellant carried something under a towel when he drove him to the motel the second time. A forensic expert testified that the victim was shot at close range. The wound to the arm, which based on blood splatters was most likely the first shot, was caused by a shot from two to three feet away.
This provided sufficient evidence to conclude that appellant intended to purposely shoot Sharp and find appellant guilty of murder. The jury evidently rejected appellant's contention that even though he took a shotgun to the victim's motel room, he did not intend to cause Sharp harm. Likewise, it rejected appellant's claim that at best, he could only be convicted of voluntary or involuntary manslaughter, because he was afraid the victim was reaching for a gun. These were claims the jury was free to discount. Only appellant's interview statements supported these claims. Consequently, the jury had to evaluate appellant's credibility of his own thought processes, including his claim that he shot the victim only once, in light of other evidence that appellant planned to bring a gun for some hours before the shooting. Further, the jury had to reconcile evidence that Sharp was shot at close range despite appellant's claim that he was in the process of cooperatively unloading the gun immediately before the shooting.
Not only is the evidence sufficient to support the jury's verdict, we, as a thirteenth juror, do not disagree that the greater weight of the evidence supports the verdict of murder. Consequently, the murder conviction was not against the manifest weight of the evidence.
Likewise, appellant acknowledged that the two codefendants had attempted to take Sharp's truck, but could not start it. A detective testified that the keys were found on the front seat. Clearly, this provides evidence that appellant had access to the car because the keys had been removed from the motel room after Sharp was shot. Although the use of force may have preceded any decision to remove the victim's property, the offense of which appellant was convicted required that he have a deadly weapon on or about his person or under his control while committing, or attempting to commit, a theft offense or fleeing thereafter. R.C. 2911.01(A) also requires that the offender brandish or use the weapon in those circumstances.
Although circumstances may demonstrate that an intent to rob was formed after force was used to disable a victim to reduce the offense from aggravated robbery to a lesser theft offense, this was not a theory presented during the trial. Compare Statev. Fontes (2000), 87 Ohio St.3d 527, 530 (a person may form the purpose to commit a criminal offense at any point during the course of a trespass). Further, there was sufficient evidence for the jury to reject appellant's claim that taking the victim's possessions was an afterthought to the shooting. The jury could have reasonably inferred that appellant planned to take the items before he arrived at the motel. Curiously, the person who drove appellant and Burke to the motel did not stay and wait for them to complete their drug purchase. Thus, the need to specifically take the truck keys moments after the shooting suggests a prior design.
Consequently, there was sufficient evidence for the jury to conclude that appellant had committed aggravated robbery. After reviewing the evidence as a "thirteenth juror", we conclude that appellant's conviction for aggravated robbery is not against the manifest weight of the evidence.
Accordingly, appellant's fifth and six assignments of error are found not well-taken.
The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is to pay the costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 __________________________________________ MELVIN L. RESNICK, J., JUDGE.
 __________________________________________ MARK L. PIETRYKOWSKI, J., JUDGE CONCUR.
 ___________________________________________________________________ RICHARD W. KNEPPER, P.J. JUDGE CONCURS IN JUDGMENT ONLY.
[1] R.C. 2903.03 defines voluntary manslaughter in pertinent part as:
 "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *"
R.C. 2903.04 defines involuntary manslaughter in relevant part as:
 "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony."